**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Swervo Development Corporation,  Civil No. 23-3066 (DWF/DJF)

Plaintiff,

v.  **MEMORANDUM**
**OPINION AND ORDER**

Everest Indemnity Insurance Company,

Defendant.

## INTRODUCTION

This matter is before the Court on Defendant Everest Indemnity Insurance Company's ("Everest") motion for summary judgment. (Doc. No. 57.) Plaintiff Swervo Development Corporation ("Swervo") opposes the motion. (Doc. No. 62.) For the reasons discussed below, the Court grants Everest's motion.

## BACKGROUND

This case centers on a loss (the "Loss") that occurred in December 2022 at a building owned by Swervo (the "Building"). The Loss was caused by the freezing and fracturing of water pipes and other components in the Building's fire sprinkler system and resulted in extensive water damage to the Building. The Loss occurred around a time when outdoor temperatures dropped sharply from the teens to below zero for several days.

Swervo purchased the Building in July 2022. (Doc. No. 60-1 at 3-6.) The Building was formerly a nursing home and was unoccupied at the time of the Loss. (Doc.

No. 62-3 ("Abdul Decl.") ¶ 6.) Later in 2022, Swervo began the process of seeking approval from the City of Minnetonka (the "City") to redevelop the land on which the Building sat, presented a proposal to renovate the Building for assisted living and memory care, and proposed the construction of a new three-story independent living facility. (Doc. No. 60-5; Abdul Decl. ¶¶ 8-9.) On November 28, 2022, Swervo presented the City Council with a changed redevelopment plan that involved the demolition of the Building. (Doc. Nos. 60-9, 60-10.) On November 30, 2022, Swervo obtained an interior demolition permit. (Doc. No. 60-6; Abdul Decl. ¶¶ 10-11; Doc. No. 62-4 ("Wiley Decl.") ¶ 3, Ex. 3 ("Rivero Dep.") at 10; Wiley Decl. ¶ 3, Ex. 4.) Swervo hired a crew of five people. (Doc. No. 60-7.) The crew worked from November 18, 2022 to December 17, 2022. (Rivero Dep. at 20.) December 17, 2022 was the last day any person was documented to be in the Building before December 29, 2022. (*See id*. at 22.)

Subcontractor, Alex Rivero, ran the crew of workers. Timecards show that he and his crew worked from November 18, 2022 to December 17, 2022. He asserts that there was heat in the building the entire time the crew was working there. (Rivero Dep. at 26.) Rivero also asserts that after December 17, 2022, he continued to do "random drive-bys" and "check-ins." (*Id.* at 23-24.) There is no evidence, however, that Rivero or any other person entered the Building after December 17, 2022. Rivero asserts that when he went back to the building on December 29, 2022 to shut off the water that was leaking as a result of the fractured pipes, the building was "still warm." (*Id.* at 48.)

The Building's heating system used four boilers that were supplemented by natural-gas air handlers and electric heaters. (Doc. No. 60-18 ("ESi Report") at 6.)

2

Everest asserts that the boilers could not be operated without natural gas and that no natural gas was used after Swervo purchased the Building. Operations Manager Mike Pierce states in his declaration that two of the boilers were for hot water and two were for heating. (Doc. No. 62-2 ¶ 5.) Pierce also stated that the boilers could be fueled by natural gas or heating oil and that boilers like those at the Building can operate independently of the natural gas supply. (*Id.* ¶¶ 6-9.) Pierce also stated that the heating boilers were operating with heating oil fuel until the Loss, and that if the oil tanks had been running low, an alarm would have sounded. (Wiley Decl. ¶ 3, Ex. 5 ("Pierce Dep.") at 16, 22-23, 25.) Swervo has also submitted evidence that the Property was equipped with wall-mounted electric heating units. (*Id.* at 28; Abdul Decl. ¶ 7.)

At the time it purchased the Building, Swervo, and its related entities, were parties to a first-party property insurance policy with Employers Insurance of Wausau (the "Wausau Policy"). (Doc. No. 60-2 at 3 (LM001560).) Swervo added the Building to the Wausau Policy. The Wausau Policy was set to expire on December 28, 2022 at 12:01 AM. (*Id.*) Swervo did not renew that policy. Instead, Swervo procured a first-party property policy with Everest (the "Everest Policy"), beginning on December 28, 2022 at 12:01 AM. (Doc. No. 60-13 ("Everest Policy") at 5.)

The Everest Policy is a blanket policy with a per occurrence limit of liability of $350 million and a sub-limit of "3,500,000 per occurrence for Property in the Course of Renovation or Repair." (*Id.* at 5, 13.) Further, the Everest Policy contains an Existing Damage Exclusion that provides that Everest "will not pay for loss or damage caused directly or indirectly by Existing Damage." (*Id.* at 58.) Existing Damage includes:

3

"[a]ny damage which occurred prior to the effective date of this policy regardless of whether such damage was apparent on the effective date of this policy or at a later date." (*Id.*) Finally, the Everest Policy contains a Protective Safeguards Endorsement, a Time Element provision and additional exclusions, and a merger clause. (*Id.* at 24, 34, 56.)

Swervo claims that on December 29, 2022, it learned that the water Loss had occurred at the Building after a neighbor reported an audible water flow alarm to the fire department. (Doc. No. 62-4 at 4-9.) The fire department noted that multiple sprinkler heads and pipes were fractured with water flowing through cracks and other damage to the sprinkler system and that there was substantial flooding in the building, including approximately ten inches of water in the boiler room. (*Id.* at 4.) The record also contains evidence that other neighbors heard an alarm coming from the Building on December 26 or December 27, 2022, and that the alarm sounded for a couple of days. (Doc. No. 62-4 at 15.) Swervo reported the Loss to Everest on January 3, 2023. (Doc. No. 60-16.) After the Loss, the Building was demolished. (Abdul Decl. ¶ 13.)

Swervo initiated this action against Everest seeking a determination that Everest is liable for the Loss, that Swervo is entitled to payment under the Everest Policy, and a monetary judgment. (Doc. No. 1.) Everest brings a motion for summary judgment, arguing that the undisputed facts show that the damage to the sprinkler system that resulted in the water damage occurred before the Everest Policy took effect.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The interpretation of an insurance policy is governed by state law. *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010.) Subject to the statutes of Minnesota, general principles of contract interpretation apply to insurance policies. *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). The goal of insurance policy interpretation is to give effect to the parties' intent. *Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.*, 615 N.W.2d 341, 344 (Minn. 2000). If policy language "is clear and unambiguous," courts effectuate the intent of the parties by "interpret[ing] the policy 'according to plain, ordinary sense.'" *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008) (quoting *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977)). In addition, under Minnesota law, courts read policies

in favor of finding coverage, construing words of inclusion broadly and words of exclusion narrowly. *Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172, 1174 (8th Cir. 2012).

Everest argues that summary judgment is appropriate here because: (1) the Everest Policy does not provide coverage for the Loss because the damage to the sprinkler system occurred before the Everest Policy was effective; (2) the Everest Policy's Existing Damage Exclusion precludes coverage; (3) Swervo failed to satisfy the conditions precedent set forth in the Everest Policy's "Protective Safeguards Endorsement"; and (4) Swervo is not entitled to "Time Element" coverage for business income.

Because the outcome of this case centers on the date of the event that caused the Loss, the Court starts there. The parties do not dispute the cause of the Loss: freezing and fracturing of components in the Building's fire sprinkler system. The parties do, however, dispute *when* the freezing and fracturing of the sprinkler components occurred. Swervo contends that the fracturing of the pipes occurred on December 29, 2022, the day the neighbor reported the alarm to the fire department. Using that date, Swervo argues that the Loss falls within the coverage of the Everest Policy. In contrast, Everest asserts that Loss was caused by water freezing in and ultimately fracturing component parts of the sprinkler system *before* December 28, 2022 and, therefore, before the Everest Policy was in effect.

If damage occurs outside the policy period, the policy does not provide coverage. *Parr v. Gonzalez,* 669 N.W.2d 401, 406 (Minn. Ct. App. 2003). The Everest Policy

6

provides coverage "per occurrence." Occurrence is defined as: "Any one loss, disaster, incident, or series of losses, disasters or incidents *which arise out of a single event or originating cause occurring during the policy period*, and include all resultant or concomitant insured losses . . . ." (Everest Policy at 39 (emphasis added.))  Thus, to trigger coverage, Swervo must show that the damage was caused by an event or originating cause that occurred during the period covered by the Everest Policy.

When damage caused by a discrete and identifiable event is detected, it triggers the policy that was in effect when the cause of the damage occurred. *See Parr*, 669 N.W.2d at 406-07 (explaining that when continuous mold damage arises from a discrete and identifiable event—*e.g.* the prior damage to a vent cap—the prior event triggers the policy in effect at the time of that event).  Minnesota law utilizes an efficient and proximate cause analysis to determine when the cause of a loss results in some appreciable damage. *See, e.g.*, *SCSC Corp. v. Allied Mutual Ins. Co.*, 536 N.W.2d 305, 317-18  (Minn. 1995) (holding in the context of apportioning damages that a discrete and identifiable event triggers only the policy in effect during the time of that event), *overruled on other grounds*, *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009).  The efficient and proximate cause of a loss is the "fundamental cause, or the cause that set the chain of events into motion." *Ken Johnson Props., LLC v. Harleysville Worcester Ins. Co.*, No. 12-cv-1582, 2013 WL 5487444, at *12 (D. Minn. Sept. 30, 2013).  Therefore, the Court is tasked with determining whether the record demonstrates, as a matter of law, that the fundamental cause of the Loss occurred before or after the Everest Policy took effect.  Here, the cause of the Loss was the freezing which resulted in

7

fracturing of the components in the Building's sprinkler system and ultimately the extensive water damage.

Everest maintains that the evidence demonstrates that the cause of the Loss, the freezing, occurred before December 28, 2022.[1]  This evidence includes the ESi Report. There is no dispute that there was a sub-zero cold snap between December 20 and December 25, 2022, and the ESi Report concludes that the drop in temperature, along with inadequate heat in the Building, resulted in the interior temperature of the Building falling below 32 degrees Fahrenheit.  (*Id.* at 25-26.)  According to the report, this in turn caused ice to form in the sprinkler system and eventually break the piping, fittings, and sprinklers.  (*Id.* at 6-7, 25.)  Everest's expert opined that the frozen water in the system acted as a "plug" until it thawed, eventually releasing the water into the Building.  (*Id.* at 6-7.)

For its part, Swervo claims that the pipes did not fracture or leak until December 29, 2022.  Swervo relies heavily on the fact that this was the day that a neighbor called the fire department to report an audible water flow alarm.  In addition, Swervo maintains that the thermostats in the building were set at 55 degrees Fahrenheit at the time of the loss (Rivero Dep. at 5-6; Wiley Decl. ¶ 3, Ex. 6 ("EFI Global Report")

---

[1]   Everest also contends that, while not material to the present analysis, the effect of the fire sprinkler's fracturing also began before the inception of the Everest Policy, pointing to evidence that water began to run out of the fractures before December 28, 2022.  The Court agrees that the fractures caused water to run before ultimately flooding the basement and triggering the alarm.  But such a finding does not impact this Order because even if the water had not run before December 28, 2022, the freezing had already occurred.

8

at 10) and workers had worked comfortably in the Building up to December 20, 2022. (Rivero Dep. at 26, 48, 51; Pierce Dep. at 35.)  Swervo also argues that Everest ignores evidence that contradicts its claim that the pipes froze before December 28, 2022.  For example, Swervo highlights the fact that an engineering report prepared by EFI Global states that the boilers in the Building *were* functioning at the time of the Loss and that they were disabled by the flooding.  (EFI Global Report at 10.)[2]

      Further, Swervo highlights that Everest's own report notes that temperatures fell below freezing for 58 days between November 1, 2022 and December 9, 2022 (ESi Report at 8 (Fig. 4)), and yet despite there being people in the building through December 20, 2022, there were no reported system failures.  (Wiley Decl. ¶ 3, Ex. 9 ("Rebuttal Report") at 130.)  Swervo also posits that to determine the point of freezing, many additional material factors must be considered.  (*Id.* at 131-32.)  Swervo submits a rebuttal report prepared by Paul A. Korpi, a metallurgical engineer.  (*Id.* at 135-39.)  In this report, Korpi concludes that the only pipe fracture date that can be determined to a reasonable degree of scientific certainty is December 29, 2022, based on his opinion that the leaking began at the same time as the pipe fracture.  (*Id.* at 138.)  Korpi states that it is

---

[2] Swervo points out that Everest's loan adjustment expert—EFI Global—opined that the leak could have started between December 20 and 28 (with December 28, 2022 falling within the scope of the Everest Policy).  That expert, however, clarified in his deposition in August 2024 that the opinion should read "between the 20th and the 26th." (Wiley Decl. ¶ 3, Ex. 7 at 73-74.)  These dates are consistent with other dates in the EFI Global Report.

possible for pipelines "to rupture due to pressure buildup of water in the piping beyond the freezepoint." (Rebuttal Report at 138.)

The record demonstrates that the event that caused the Loss was the freezing and ultimate fracturing of the components of the sprinkler system. And while the record shows that water was leaking and an alarm was sounding as of December 29, 2022, that date does not coincide with the actual freezing that caused the leaks and, ultimately, the alarm to sound. Everest has pointed to record evidence demonstrating the contrary—that the freezing occurred days before December 29, 2022. First, the neighbor who called the fire department had been hearing the alarm all day (Doc. No. 62-4 at 9), and there is record evidence that other neighbors heard an alarm coming from the Building for a couple of days beginning on December 26 or 27, 2022. (Doc. No. 62-4 at 15.) In addition, expert evidence shows that the extended period of cold weather leading up to the discovery of the Loss caused water in the sprinkler system to freeze and break components *before* December 27, 2022 and likely before December 25, 2022. Everest's explanation for the delay between the event and its discovery is that frozen water acted as a "plug" which was released when the temperatures rose. This explanation is supported by the undisputed local airport weather data that shows that temperatures dropped sharply between December 20 and December 25, 2022, and then gradually rose so that the maximum temperature was above freezing by December 28 and 29, 2022.

Swervo attempts to create an issue of fact by highlighting the fact that the alarm sounded on December 29, 2022, pointing out inconsistencies in the expert opinions, and via its own expert rebuttal claiming it is not possible to determine the time and date of the

system failures. In addition, Swervo has pointed to evidence that the heating system in the Building was operating. However, this evidence does not create a genuine issue of material fact because it does not contradict Everest's expert evidence about the freeze date. Even considering the timing of the alarm and accepting that the boilers were operating (and the evidence suggests otherwise), the record demonstrates that the freezing and initial fracturing of the components occurred before the Everest Policy took effect, even if the results of the freezing were not evident until December 29, 2022. Moreover, Swervo's rebuttal expert opinion does not create a genuine issue of fact because that opinion concedes that fracturing can happen in the piping beyond the freeze point and it does not contradict Everest's evidence that the freezing and fracturing occurred before December 27, 2022 and that the frozen water acted as a plug until the outdoor temperatures rose.

Based on a careful review of the factual record in this case and viewing that evidence in the light most favorable to Swervo, the Court concludes that Swervo has not created a genuine issue of material fact on the date that the freezing and initial fracturing of the sprinkler components occurred. Instead, Everest pointed to record evidence demonstrating that the freezing and initial fracturing occurred before December 28, 2022. Therefore, the Everest Policy does not apply to the Loss as a matter of law and summary judgment is properly granted.[3]

---

[3] Because the Court concludes that the Everest Policy does not, as a matter of law, cover the asserted Loss, the Court does not reach the alternative arguments in support of summary judgment.

11

**ORDER**

Based on the foregoing and the record in this case, **IT IS HEREBY ORDERED** that Defendant Everest's motion for summary judgment (Doc. No. [57]) is **GRANTED** and Swervo's complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 13, 2025                                   s/Donovan W. Frank
                                                        DONOVAN W. FRANK
                                                        United States District Judge